UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
03 MAR 27 AM 9:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

ANTHONY A. MONTAGUE,    )
                        )
    Plaintiff,          )
                        )
vs.                     )   Civil Action No. CV-02-S-0530-NE
                        )
ASPLUNDH TREE EXPERT CO.,)
                        )
    Defendant.          )

ENTERED
MAR 27 2003
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**MEMORANDUM OPINION**

Plaintiff, Anthony A. Montague, claims that his former employer, Asplundh Tree Expert Co., terminated his employment because of his race (African American) and in retaliation for his opposition to discrimination in the workplace, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, as well as 42 U.S.C. § 1981. The case presently is before the court on three motions filed by defendant: a motion for summary judgment (doc. no. 37); a motion to strike the declaration of Melvin Whitman (doc. no. 49); and a motion to file a reply brief (doc. no. 51).

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

57

317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment is due to be granted, and, the motions to strike the declaration of Melvin Whitman and to file a reply brief should be denied as moot.

## I. SUMMARY OF FACTS

### A.   Defendant's Organizational Hierarchy

Defendant "provides a variety of services to the electric utility industry, primarily clearing trees, brush, and undergrowth from electrical power lines."[1] These tasks are performed by "crews" of two to six workers, with each being supervised by a "Crew Foreman." The Crew Foreman is supervised, in turn, by a "General Foreman." The General Foreman reports to a "Supervisor." Additionally, defendant sometimes employs an intermediate-level supervisor called a "Coordinator," who is ranked between Crew Foremen and General Foremen.[2] Coordinators usually supervise

---

[1] Defendant's brief, at 2-3.

[2] *Id.* Stated differently, the organizational hierarchy from top to bottom is as follows: Supervisor; General Foreman; Coordinator; Crew Foreman; and crew members.

several crews and perform administrative and logistical functions, such as payroll, invoicing, and supply.[3] Defendant's Huntsville division currently employs Randy Parham as Supervisor (Caucasian male), Troy Rice as General Foreman (Caucasian male), and Marty Rowell (Caucasian Male) and Al Gilbert (African American male) as Coordinators.[4]

**B.     Plaintiff's Employment History With Defendant**

Plaintiff was hired by defendant on or about May 5, 1991, to work as a crew member in the Huntsville, Alabama area.[5] Plaintiff received numerous promotions during the following years, and eventually was promoted to Crew Foreman on a date that he could not recall.[6] In 1997, defendant created a Coordinator position in Huntsville, and plaintiff was selected to fill the vacancy.[7] Two years after the promotion, defendant lost half of its contract with its major client, Huntsville Utilities. As a result, plaintiff's Coordinator position was eliminated and he was demoted to his previous position of Crew Foreman.[8] Plaintiff does not allege that this demotion was motivated by either a racially discriminatory or retaliatory animus.[9]

In the summer of 2000, defendant regained some of its lost business with Huntsville Utilities, and defendant consequently required two new Coordinators. Plaintiff and Lonnie Bridges (Caucasian male) were interviewed and selected to fill the positions.[10] Bridges later was voluntarily demoted to a Crew Foreman position, and Marty Rowell (Caucasian male) was promoted to the

---

[3] Defendant's evidentiary submissions, Montague deposition, at 44-45.
[4] Defendant's brief, at 3.
[5] Defendant's evidentiary submissions, Montague deposition, at 28.
[6] *Id.*, at 38-39.
[7] *Id.*, at 44.
[8] *Id.*, at 47-48.
[9] *Id.*, at 48.
[10] *Id.*, at 21-22.

Coordinator slot vacated by Bridges.[11]

During his second stint as a Coordinator, plaintiff worked closely with Rowell and three employees of Huntsville Utilities — Supervisor Jeff Jordan (Caucasian male) and two Coordinators, Melvin Whitman and Charlie Davis (both African American males).[12] These persons assigned jobs to defendant, and plaintiff and Rowell ensured that the assigned work was performed properly by defendant's work crews. Plaintiff performed this job throughout the remainder of his employment with defendant.

No complaints regarding plaintiff's performance of his job duties and responsibilities were ever lodged by anyone in or outside the company. In fact, during April of 2001, plaintiff was recruited by defendant to fill a General Foreman position in Atlanta, Georgia.[13] Plaintiff declined to interview for the position, however, because he had no desire to relocate.[14]

C.  **Plaintiff's Opposition to Racial Harassment and Discrimination in the Workplace**

Plaintiff testified during deposition that, throughout his employment with defendant, he frequently voiced opposition to racially-offensive behavior and perceived harassment and discrimination in the workplace.[15] Plaintiff's testimony regarding his complaints is largely vague and nonspecific, however, and it cannot readily be distilled into discrete episodes.

D.  **Circumstances Surrounding Plaintiff's Termination**

   1.  **Rumors of sexual harassment**

On Friday, April 6, 2002, plaintiff confronted his fellow Coordinator, Marty Rowell,

---

[11] Defendant's brief, at 7; Defendant's evidentiary submissions, Montague deposition, at 52.
[12] Apparently, Huntsville Utilities uses some of the same job titles as defendant.
[13] Defendant's evidentiary submissions, Montague deposition, at 197-200.
[14] *Id.* at 197-98. More specifically, plaintiff told management that "I ain't going to no Atlanta."
[15] *See* defendant's evidentiary submissions, Montague deposition, at 33, 57-59, 63-69, 74-75, and 90-91.

-4-

regarding a rumor circulating among defendant's employees that several individuals (Rowell, Rice, and Jordan) were trying to persuade one of defendant's female Crew Forepersons, Amanda Brown, to accuse Melvin Whitman (a Coordinator for Huntsville Utilities) of sexual harassment. Rowell denied knowledge of such a scheme.[16]

The following Monday morning, Rowell relayed plaintiff's accusation to Rice and Jordan.[17] That same morning, Jordan called a meeting at Huntsville Utilities to discuss the rumors.[18] Jordan, Whitman, Rice, Rowell, and plaintiff attended.[19]

Jordan opened the meeting by restating the substance of the rumor.[20] Rice and Jordan then denied that the rumor was true.[21] Whitman responded by saying that he did not believe Jordan and Rice, in part because Rowell and his work crew were taking notes regarding what transpired at their work sites, presumably for the purpose of gathering evidence against him (Whitman).[22] Plaintiff then voiced his opinion by saying to Rowell:

> If you're going to tell your crew to do this and do this, that's going to make Melvin [Whitman] think that you're being sneaky and underhanded behind his back. And I said, Melvin, if you go to the crew that's going to make Marty [Rowell] think that you're being sneaky and underhanded. I said, y'all just need to come together, you know, come together like men and just talk and you wouldn't have this problem. And that's the only thing I said . . . ."[23]

Jordan then commented that plaintiff's argument made a "good point,"[24] and asked each person

---

[16] *Id.*, at 103-05.

[17] *Id.*, Rowell deposition, at 14.

[18] *Id.*, Montague deposition, at 105, 108.

[19] *Id.*, at 107.

[20] *Id.*, at 109.

[21] Defendant's evidentiary submissions, Montague deposition, at 109-10, 116.

[22] *Id.*, at 110-12.

[23] *Id.*, at 114.

[24] *Id.*, at 114.

whether there were any other issues they needed to "air out." After each person responded negatively, Jordan adjourned the meeting.[25]

### 2. Plaintiff's argument with his General Foreman

After the meeting, Rice directed Rowell and plaintiff to meet him by his truck in the parking lot.[26] Rice then upbraided plaintiff for his comments to Rowell, saying "don't you ever go into a meeting against [defendant]."[27] Plaintiff protested that he had not done anything wrong, and adding:

> you [Troy Rice] can't just talk to me any kind of way because I am thirty-one years old and I don't talk to my kids like that and you're not going to talk to me like that. And I said, you or anybody else in this company ain't going to dictate what I say or cannot say.[28]

The discussion quickly degenerated from an argument into a shouting match, which led Rice to conclude that plaintiff was too upset to work, and he suspended plaintiff's employment for the remainder of the day.[29]

As plaintif entered his company-owned truck to depart, he overheard Rice shout to Rowell, "I did all I can do for him [plaintiff], I'm through with him."[30] Plaintiff took offense, exited his truck, and resumed his argument with Rice, telling him "you ain't done nothing for me," and mentioning several incidents in which plaintiff felt that Rice had not properly supported him.[31] Rice responded by telling plaintiff "you're suspended indefinitely, give me your [truck] keys."[32] Plaintiff

---

[25] *Id.*, at 115.
[26] *Id.*, at 118.
[27] Defendant's evidentiary submissions, Montague deposition, at 119.
[28] *Id.*, Montague deposition, at 120.
[29] *Id.*, at 119, 124.
[30] *Id.*, at 121.
[31] *Id.*, at 121-22.
[32] *Id.*, at 122.

then removed the key to the company truck from his chain and "pitched" it to Rice.[33] "The key hit [Rice's] chest and he caught the key just like that (indicating)."[34] Rice and plaintiff then continued to bicker.

> [H]e [Rice] didn't cuss, that I recall, and I didn't cuss, I know. I know I didn't cuss him. But we was yelling and he kept hollering you need to quiet down, you work for Huntsville Utilities through contract. And I said, you need to quiet down too. I said, you can't just yell and scream at me, you know. And then I told him, I said, that's all right, I'm going to get you for all this racism, you and the company once and for all. He said, oh, you can go get the NAACP and get your lawyers or whatever you want, I don't care.[35]

Plaintiff then demanded that Rice drive him home, because he no longer had transportation.[36]

During the trip to plaintiff's residence, except for a few quiet intervals, Rice and plaintiff "yelled and screamed all the way to the house."[37] Plaintiff continued to protest Rice's behavior, saying "you can't keep yelling at me, you need to stop, I'm the Supervisor, I'm a man."[38] Rice finally stopped shouting "after he seen I wasn't going to stop yelling."[39] Plaintiff then accused Rice and defendant's management of offering him the Atlanta promotion to "get rid of [him], instead of dealing with the issues."[40] Plaintiff's vague deposition testimony does not specify the "issues" that he wanted defendant to address, although the context suggests that plaintiff was referring to his perception that defendant discriminated against African Americans (or perhaps, given the reason for the meeting at Huntsville Utilities, women).[41]

---

[33] Defendant's evidentiary submissions, Montague deposition, at 122.
[34] *Id.*, at 122-23.
[35] *Id.*, at 123-24.
[36] *Id.*, at 124.
[37] *Id.*
[38] *Id.*
[39] Defendant's evidentiary submissions, Montague deposition, at 125.
[40] *Id.*, at 126.
[41] *Id.*, at 126-27.

About halfway through the trip to plaintiff's residence, plaintiff realized that he had left his house key in his company-owned truck.[42] As a result, Rice turned around and drove plaintiff back to his assigned vehicle to retrieve the key.[43]

On the way back to the truck, Rice asked plaintiff if he wanted to meet with Steve Bostock (defendant's Vice President) and Randy Parham (Supervisor) regarding his concerns.[44] Plaintiff said that he did, and Rice agreed to arrange a meeting the following day.[45] Upon arrival at plaintiff's truck, Rice returned plaintiff's ignition key and told him to drive home.[46] Rice said, "we both need to cool down, I'll see you in the morning."[47] Plaintiff encountered Whitman on his way home, and recounted his argument with Rice.[48]

### 3. Defendant's decision to terminate plaintiff's employment

After leaving plaintiff in the Huntsville Utilities parking lot, Rice reported the incident to Supervisor Randy Parham.[49] Parham instructed Rice to telephone Kerry Miller, defendant's Compliance and Equipment Supervisor.[50] He did so, and recounted the incident.[51] That same day, Miller met with Parham to discuss both the meeting that had occurred at Huntsville Utilities and the subsequent argument between Rice and plaintiff.[52] Miller later discussed both matters with

---

[42] *Id.*, at 133.

[43] *Id.*

[44] *Id.*, at 129.

[45] Defendant's evidentiary submissions, Montague deposition, at 129.

[46] *Id.*

[47] *Id.*

[48] *Id.*, at 129-30.

[49] *Id.*, Rice deposition, at 53.

[50] *Id.* at 54; *see* Miller affidavit.

[51] At some unspecified point in time, Rice faxed Miller statements from himself, Rowell, and Brown, detailing their knowledge of the incidents in question. The statements are dated April 9, 11, and 12, 2003. Defendant's brief, at 16; Miller deposition, at Plaintiff's Exhibits 1-3 (employee statements).

[52] Defendant's brief, at 17; Miller deposition, at 46.

defendant's General Counsel.[53]

Following his investigation, Miller concluded that plaintiff's statements during the meeting at Huntsville Utilities and his later behavior toward Rice were insubordinate.[54] Insubordination is described in defendant's employee handbook as an offense warranting termination, and Miller instructed Rice to terminate plaintiff's employment, effective April 12, 2001.[55]

### 4. Plaintiff's request for re-hire

Plaintiff mailed a letter to defendant's EEO Officer on May 3, 2001, requesting that he be re-hired.[56] His request was denied on May 22, 2001, however, because former employees terminated for insubordination were not eligible for rehire under defendant's written policies.[57]

### 5. Plaintiff's EEOC charge and legal action

Plaintiff filed a charge with the Equal Employment Opportunity Commission on July 2, 2001, complaining of race discrimination and retaliation.[58] The EEOC issued a right-to-sue letter on December 6, 2001,[59] and plaintiff commenced this action on February 28, 2002.[60]

---

[53] Defendant's evidentiary submissions, Miller deposition, at 54.

[54] *Id.*, at 41.

[55] *Id.* at 52.

[56] *Id.*, Montague deposition, at Exhibit 7 (Montague letter May 3, 2001).

[57] *Id.*, at Exhibit 10 (Asplundh letter May 22, 2001). Defendant's written rehire policy states that "no one who has been terminated from Asplundh Tree Expert Co. or any subsidiary of Asplundh will be eligible for rehire." *Id.* at Exhibit 9 (Bostock letter Jan. 5, 1998).

[58] *Id.*, at Exhibit 11 (Montague EEOC charge July 5, 2001).

[59] Defendant's evidentiary submissions, Montague deposition, at Exhibit 12 (EEOC Right-to-Sue letter Dec. 6, 2001).

[60] Complaint (doc. no. 1).

## II. DISCUSSION

A.  **Racially-Discriminatory Termination**[61]

Plaintiff does not contend that he has direct evidence of a racially-discriminatory animus. His claims accordingly must be evaluated under the analytical framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L. Ed. 2d 668 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under that now familiar framework, plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S. Ct. at 1093-94 & n.6. "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094). To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by [a] discriminatory animus," *Burdine*, 450 U.S at 257, 101 S. Ct. at 1096, the presumption of discrimination created by the prima

---

[61] Plaintiff's Title VII and § 1981 race discrimination claims require the same proof to show liability. "Thus, the [c]ourt will address [plaintiff's] Title VII discrimination claim with the express understanding that the analysis applies to [his § 1981] claim as well." *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1181 (N.D. Ala. 1999); citing *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S. Ct. at 1094-95 & n.10. The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). If a plaintiff does so, then he "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106.

1. **Prima facie case**

Plaintiff claims that defendant terminated his employment because he is an African American. In discharge situations, courts generally require a plaintiff to demonstrate that: (1) he was a member of a class of persons protected by the statute; (2) he was qualified for the position from which he was discharged; (3) he nevertheless was terminated; and (4) following his discharge, the defendant either replaced plaintiff with someone outside the protected class, or retained other employees who were not within the protected class, and, who possessed comparable or lesser qualifications. *See, e.g., Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6

(11th Cir. 1998); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980). Further, since plaintiff also is challenging defendant's application of discipline for violation of work rules, he must show either: "(a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against other persons who have engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989) (citation omitted); *see also Jones v. Bessemer Carraway*, 137 F.3d at 1311 n.6 (questioning and elaborating on the prima facie case set forth in *Jones v. Gerwens*).

Here, plaintiff cannot demonstrate a prima facie case. First, it is readily apparent that plaintiff violated a work rule. While defendant's employee discipline policy apparently does not define what behavior constitutes insubordination, *Black's Law Dictionary* defines the term as: "1. A willful disregard of an employer's instructions, esp. behavior that gives the employer cause to terminate a worker's employment. 2. An act of disobedience to proper authority; esp. a refusal to obey an order that a superior officer is authorized to give." *Id.* at 802 (7th ed. 1999) (Bryan A. Garner, ed.).[62] Plaintiff's own deposition testimony makes it abundantly clear that his behavior during the argument with Rice meets that definition — *e.g.*, plaintiff shouted at Rice for an extended period of time, despite Rice's demands that plaintiff stop shouting. Plaintiff also threw his truck's ignition key at Rice, striking him in the chest. *See* § I(D)(2) *supra*. Moreover, plaintiff's brief identifies no similarly-situated employee outside his protected class who engaged in similar

---

[62] *See also Webster's II New Riverside University Dictionary* 633 (1994) (defining "insubordinate" as "[n]ot submissive to authority" or "disobedient").

misconduct, but received less severe punishment.[63]

### 2. Defendant's stated reason for plaintiff's termination and pretext

Even if this court were to overlook plaintiff's failure to demonstrate a prima facie case, defendant proffers plaintiff's insubordinate behavior as the nondiscriminatory reason for his termination. Plaintiff attempts to prove that basis is not the real reason for his discharge with the following series of arguments:

> There are five material points from which a reasonable jury may well conclude that [defendant] did not act in good faith [in terminating plaintiff's employment]: (1) Mr. Rice initiated the confrontation; (2) Mr. Rice's objection to [plaintiff's] conduct at the meeting was not reasonable; (3) [plaintiff] had spoken up on behalf of African-American employees, including very recently; (4) Mr. Rice was pushing [plaintiff] to leave Alabama in order to take a promotion in Atlanta, but [plaintiff] declined; and (5) [plaintiff] was fired without ever having an opportunity to reply to Mr. Rice's accusation.[64]

These arguments, while perhaps engendering some degree of sympathy for plaintiff, do nothing to prove pretext, because none address the core fact — *plaintiff clearly was insubordinate to his supervisor*. None serve to relieve plaintiff from the consequences of his actions, nor do they compel defendant to tolerate such behavior. This court concludes that no reasonable factfinder would reasonably conclude, on the basis of plaintiff's arguments, that defendant's stated reason for his termination is pretextual. Accordingly, plaintiff's race discrimination claim is due to be dismissed.

### B. Retaliation

Plaintiff alternatively argues that defendant terminated his employment in retaliation for his

---

[63] Defendant, on the other hand, points out that it terminated a Caucasian Crew Foreman named David Bridges in January of 2001 for insubordination after that individual cursed and threatened Rice and threw his keys at him. *See* defendant's evidentiary submissions, Rice Affidavit ¶ 8.

[64] Plaintiff's brief, at 5.

opposition to discrimination in the workplace. "Retaliation is a separate violation of Title VII."[65] *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000). A plaintiff generally must prove three elements to establish a prima facie case of retaliation: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Gupta*, 212 F.3d at 587; *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action. . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted).

Even assuming that plaintiff can demonstrate a prima facie case, his retaliation claim still is due to be dismissed for the same reasons previously discussed: defendant's stated reason for plaintiff's termination has not been shown to be pretextual.

---

[65] The following analysis is equally applicable to that portion of plaintiff's retaliation claim based upon 42 U.S.C. § 1981. *See Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis); *Moss v. W & A Cleaners*, 111 F. Supp. 2d 1181 (M.D. Ala. 2000); *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 1176, 1185 (N.D. Ala. 1999).

## III. CONCLUSION

Defendant's motions to file a reply brief and to strike the declaration of Melvin Whitman are denied as moot. Defendant's motion for summary judgment is granted. An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this __27th__ day of March, 2003.

_____
United States District Judge